IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FREDERICK BERNDT,

          Plaintiff,

          vs.                         Case No. 03-1283-JTM

GARY KRAMER, M.D.,

          Defendant.

## MEMORANDUM AND ORDER

       This matter comes before the court on the defendant's Motion for Partial Summary

Judgment (Dkt. No. 77). After reviewing the parties' arguments, the court grants defendant's

motion.

## I. FINDINGS OF FACT

       The court has already set out the nature of the case and factual background in its prior

December 29, 2004 ruling. The parties add the following additional facts:

       Jerry D. Peterie, M.D. was one of the plaintiff's treating physicians. The plaintiff has

designated Dr. Peterie as an expert in this matter. <u>See</u> Dkt. No. 78, Exhibit A (Dr. Peterie's

report). Dr. Peterie examined the plaintiff on October 24, 2000, after he had been referred to him

by Dr. Kramer. In his report, Dr. Peterie noted that Dr. Kramer performed an open reduction

with internal fixation procedure on the plaintiff's calcaneous fracture on June 14, 2000. Dr.

Peterie notes that "[f]ollowing surgery and within about thirty days after discharge from the

hospital, [plaintiff's] wound began draining."  Dr. Peterie states in his report that the plaintiff's

wound "required an irrigation and cleaning of the wound on August 4, 2000."  In an effort to

treat the infection present in the plaintiff's right lower extremity, Dr. Kramer ordered that

antibiotics be administered to him via IV. Dr. Peterie notes in his report that the "tobramycin was

given three times a day at doses ranging from 100 mg to 140 mg from August 15, 2000 to

September 12, 2000."  The plaintiff was not given any tobramycin after September 12, 2000.

Following Dr. Kramer's treatment regimen involving tobramycin, Dr. Peterie notes that

"the infection persisted resulting in the referral to" him on October 24, 2000.  Dr. Peterie states in

his report that "Dr. Kramer's care and treatment of the wound infection fell below the standard of

care as follows:

> A. Giving tobramycin alone without another antibiotic for osteomyelitis is not
> acceptable;
> B. Starting the antibiotic therapy with the hardware in place was not acceptable.
> The hardware, a source of infection should have been removed before the
> administration of the tobramycin;
> C. The dosage of tobramycin should have been 320-400 mg once per day. The
> serum level should have then been done as tobramycin is an otoxic drug known to
> cause deafness and tinnitus. The way tobramycin was administered was
> ineffective and the failure to test as stated is not acceptable.

Dkt. No. 78, Exhibit A.  Dr. Peterie concludes his report by stating that by "improperly treating

the infection, Mr. Berndt was deprived of a reasonable chance of saving his leg which was

eventually amputated."  Each of the opinions offered by Dr. Peterie was arrived at based upon his

examination of the plaintiff on October 24, 2000.

In his deposition, Dr. Peterie testified that if Dr. Kramer had properly administered the

tobramycin, the plaintiff would have had a 50% chance to salvage his right leg.  Dr. Kramer

administered tobramycin without another antibiotic for osteomyelitis from August 15, 2000 to

2

September 12, 2000.  Dr. Kramer started the antibiotic therapy with the hardware in place on

August 15, 2000.  Dr. Peterie testified Dr. Kramer should have removed the hardware that was

inserted in plaintiff's foot when he "got a culture back that showed Pseudomonas."  Dkt. No. 78,

Exhibit B, at 21:16-21 (Deposition of Dr. Peterie).  A culture was obtained by Dr. Kramer that

revealed a pseudomonas infection on August 4, 2000. During the timeframe of August 15, 2000,

to September 12, 2000, tobramycin was administered to the plaintiff three times a day, in doses

ranging from 100 mg to 140 mg . Each of the negligent acts listed by Dr. Peterie occurred on or

before September 12, 2000.  It is Dr. Peterie's opinion that the deviations from the standard of

care set forth in his report deprived the plaintiff of a chance to save his right lower extremity,

which was eventually amputated.

      Dr. Peterie testified during his deposition that the reason that the plaintiff's right lower

extremity was amputated was because of the pseudomonas infection that was present prior to

October 24, 2000.  Dr. Peterie testified that the plaintiff was aware of the pseudomonas infection

present in his leg prior to coming to see him on October 24, 2000. During the deposition of Dr.

Peterie, the following exchange took place:

> Q: Okay. And, Doctor, is it your opinion that the reason Mr. Berndt's right lower
> extremity was amputated in this case was because of the infection?
> A: Yes.
> Q: And Mr. Berndt knew he had that infection prior to coming to see you, correct?
> A: Yes.

Dkt. No. 78, Exhibit B, at 38:10-18.  Later in his deposition, the following testimony was offered

by Dr. Peterie:

> Q: And again, the last question, I think I asked you this before, but the reason Mr.
> Berndt lost his right foot was because of the infection, the Pseudomonas infection
> that we discussed in detail today?

A: Yes.

Dkt. No. 78, Exhibit B, at 44:21-45:2.  The plaintiff testified that on October 24, 2000, he learned for the first time that the ringing in his ears was going to be permanent.  The plaintiff did not learn anything new about the infection from Dr. Peterie on October 24, 2000, except for the need for amputation.  After Dr. Peterie's examination, the plaintiff returned to see Dr. Kramer and told him that "Dr. Peterie told us we ought to just have [his right foot] amputated and that would get rid of the infection . . ."  <u>See</u> Dkt. No. 78, Exhibit C, at 119:16-23 (Deposition of Frederick Berndt).

Plaintiff noted the following additional facts.  On September 1, 2000, John Gilbert, M.D. had no criticisms of the ongoing infection treatment. He examined plaintiff, diagnosed his condition but did not offer treatment suggestions. On September 1, 2000, John Gilbert, M.D. opined that the tobramycin treatment was going to be a permanent infection; however, if properly treated, the pseudomonas infection may become dormant and/or latent.  Plaintiff continued to treat with Gary Kramer, M.D. through February 2001.  On October 24, 2000, plaintiff was first advised not to ever use more tobramycin.  On October 24, 2000, the possibility of amputation of his right leg was first discussed with plaintiff.

## II. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party.  <u>Jurasek v. Utah</u>

State Hosp., 158 F.3d 506, 510 (10th Cir. 1998).   The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

## III. ANALYSIS

The court incorporates by reference its analysis from its December 29, 2004 ruling. Based on prior rulings, the only issue for summary judgment is whether there were any "subsequent, intervening negligent actions" that occurred on or after October 24, 2000, that led to the amputation of plaintiff's right lower extremity.  After reviewing the parties' additional facts, the court finds that there were no subsequent, intervening negligent actions.

The court has already found that the infection was known to be permanent before October 24, 2000, based on plaintiff's visit with Dr. Gilbert.  See Dkt. No. 53.  See also Hecht v. First National Bank & Trust Co., 208 Kan. 84, 490 P.2d 649 (1970); Cleveland v. Wong, 237 Kan.

5

410, 701 P.2d 1301 (1985); and <u>Jones v. Neuroscience Assoc., Inc.</u>, 250 Kan. 477, 827 P.2d 51 (1992).  Based on the expert testimony, the administration of the tobramycin first occurred more than two months before October 24, 2000.  The last date of the tobramycin being administered was on September 12, 2000.  There were no subsequent intervening acts of negligence that occurred after October 24, 2000, and there were no injuries caused after that date.  The infection was known as of September 1, 2000; the error in treatment, which led to the amputation of plaintiff's leg, did not result in a new infection or a  new injury.  <u>Med James Inc. v. Barnes</u>, 31 Kan.App.2d 89, 61 P.3d 86 (2003) (noting that the "critical information to trigger the running of the statute of limitations is knowledge of the fact of injury, not the extent of injury.").  Rather, the amputation was the result of the initial infection, which had been improperly treated.  Thus, summary judgment is appropriately granted to defendant on this issue.  The only remaining issue is the tinnitus injury.

IT IS ACCORDINGLY ORDERED this 13th day of January 2006, that the court grants defendant's Motion for Summary Judgment (Dkt. No. 77).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

6